# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| VADIM KOZYRKOV, | ) |
|     PLAINTIFF, | ) |
| | ) No. 16 C 6961 |
| v. | ) |
| | ) Judge Thomas M. Durkin |
| ACULOCITY, LLC, | ) |
|     DEFENDANT. | ) |

**MEMORANDUM OPINION AND ORDER**

On March 9, 2006, California resident Vadim Kozyrkov, non-party GVW Holdings, LLC ("GVW"), and Illinois-headquartered Aculocity, LLC ("Aculocity" or "the company") executed a Limited Liability Company Agreement in connection with the Delaware filing of Aculocity's Certificate of Formation. The Agreement establishes Kozyrkov's role as an employee and Class A member of Aculocity, and sets forth his various rights and obligations in connection with that role, including his rights and obligations upon termination. A superseding contract signed by the same parties and Tech Trust U/A/D 4/10/10 ("Tech Trust"), the assignee of GVW's Class A and Class B Units, was executed on May 1, 2010. Kozyrkov was terminated from Aculocity on July 3, 2013, and was paid nothing by the company in connection with the mandatory sale of his membership interest. Kozyrkov brings this suit alleging that Aculocity failed to fulfill its purchase obligations under the Agreement. He also seeks an accounting and access to the company's books and records. Because the parties are diverse and the amount in controversy exceeds

$75,000, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. *See* R. 34.

Aculocity moves to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. R. 19. For the reasons set forth below, that motion is denied in part and granted in part.

**Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In

applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party.[1] *Mann*, 707 F.3d at 877.

## Background

Kozyrkov was a founding member and original employee of Aculocity, a Delaware limited liability company incorporated on March 9, 2006. R. 1 ¶ 7. On the day the company's certificate of formation was filed, Kozyrkov signed the Limited Liability Company Agreement of Aculocity, LLC (2006 Agreement) with Aculocity's other founding member, GVW. *Id.* According to the 2006 Agreement, Kozyrkov was under no obligation to make a capital contribution—defined as "the amount of cash and the value of any property (other than cash) contributed to the [company]." (Art. I, clause (e)). Rather, in recognition of "services rendered," the 2006 Agreement granted him ownership of 10,000 of the company's 40,000 Class A units.[2] (Arts. 5.1,

---

[1] A motion under Rule 12(b)(6) can be based "only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) (citations omitted). However, a party opposing a Rule 12(b)(6) dismissal may elaborate on the factual allegations in the complaint so long as the new elaborations are consistent with the pleadings. *Id.* (collecting authority). In deciding this motion, the Court therefore considers the applicable LLC Agreements, mentioned throughout the complaint and filed under seal by Aculocity in connection with its motion to dismiss, as well as the additional facts set forth by Plaintiff's counsel in the affidavit attached to Kozyrkov's response brief.

[2] All remaining Class A Units and all 60,000 Class B Units were allocated to managing member GVW. (Art. 5.1, Ex. A). The Agreement also gave Kozyrkov the right to purchase additional Class A units at a fixed price during a period of months by tendering notice and payment to Aculocity. (Art. 5.4). Kozyrkov did not exercise that option, which expired on March 9, 2009. *See* 2010 Amended Agreement, Art. 5.4 ("The Vadim Option as defined in the 2006 Agreement was not exercised and has expired.").

5.2, Ex. A). According to Kozyrkov, in consideration of his 10% ownership interest and "what [he] understood would be an opportunity to build a company . . . in whose long-term profits and/or increased value he would share," he agreed to work for Aculocity at a salary not commensurate with his experience and level of expertise.[3] R. 27 ¶ 3A.

As a Class A member, Kozyrkov was entitled to profit distributions "at such times and in such amounts as determined by the manager," subject to tax withholdings and setoffs for past-due obligations or advances on income tax payments. (Arts. 6.1-6.4). It is unclear from the complaint whether any such distributions were ever made, though it is alleged that to the extent they were, they were never paid out to Kozyrkov, but instead were "placed in [his] capital account." R. 1 ¶ 9. In addition to these entitlements of membership, Kozyrkov was obligated to pay income taxes on the amount of Aculocity's profits and losses allocated to his

---

[3]   Article II of the Agreement, which follows the definitions section, reads:

> Each Member hereby represents and warrants that: (a) such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the LLC and is capable of making an informed investment with respect thereto; (b) such Member is able to bear the economic and financial risk of an investment in the LLC for an indefinite period of time; (c) such Member is acquiring Units in the LLC for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof . . . and (f) this Agreement is valid, binding and enforceable against such Member in accordance with its terms.

The amended agreement, executed in 2010, contains an identical provision. Both agreements also contain a comprehensive integration clause noting, among other things, that the agreements "contain[ ] the entire understanding among the Members."

capital account. (Arts. 6.4-6.7). He was prohibited from withdrawing any capital contributed to his account (Art. 5.7), except upon liquidation or dissolution (Arts. 10.2-10.4), or in Kozyrkov's case as an employee member, upon dissociation (Art. 9.1).

The Agreement provided that in the event Kozyrkov dissociated, whether upon death, permanent disability, resignation, retirement, insolvency or termination with or without cause (Art. I(k)), the company and its remaining members had the right, but not the obligation, to purchase—and Kozyrkov had the obligation to sell—his membership units (Art. 9.1). The purchase price for the units was to be "the lower of [ ] the aggregate cash contributions to the [company] on account of such Units less all distributions made on account of such Units; and [ ] the Fair Market Value of such Units."[4] (Art. 9.3(b)). In the event that the purchase price for Kozyrkov's units exceeded one-third of Aculocity's net income, the Agreement entitled the company to defer payment up to 36 months. (Art. 9.3(e)).

On May 1, 2010, the parties entered into the First Amended and Restated Limited Liability Company Agreement of Aculocity, LLC (2010 Agreement), the primary purpose of which was to memorialize a transfer by GVW of its Class A and Class B units to third-party Tech Trust. R. 1 ¶ 10; (2010 Agreement, Recitals). Though differently numbered, the provisions of the 2010 Agreement corresponding with those set forth above were identical or substantially similar to those in the

---

[4] The purchase price also contemplated offsets for any amounts owed to the company by the dissociating member.

2006 Agreement, with two notable exceptions.[5] First, unlike the 2006 Agreement, which stated that that Kozyrkov received his membership units without making any capital contribution, the 2010 Agreement recognized that "[e]ach of the Class A Members . . . have contributed property to the capital of Aculocity and have received [their] respective Units."[6] (Art. 5.1). The Agreement did not specify what "property" Kozyrkov contributed, but he alleges that he "understood that the property thus referred to" was the amount of undistributed profits allocated to his capital account, less the income tax payments Aculocity paid on his behalf. R. 1 ¶ 14. Second, the 2010 Agreement created a new schedule for determining the purchase price of Kozyrkov's Units upon termination:

> Purchase Price. The purchase price of the Dissociating Units shall equal the number of Units to be purchased multiplied by (i) if [Kozyrkov]'s employment terminates for a reason other than for Cause, the lesser of (A) the Fair Market Value of the Units as of the date the Dissociation Right is exercised; and (B) the amount of cash contributed by [Kozyrkov] to Aculocity for the Units; and (ii) if [Kozyrkov]'s employment is terminated for Cause, the lesser of fifty percent of (X) the Fair Market Value of the Units as of the date the Dissociation Right is exercised; and (Y) the amount of cash contributed by [Kozyrkov] to Aculocity for the Units.

(Art. 8.7(b)).

---

[5] A third notable exception, which is not relevant to this motion but certainly is relevant to the case, is that the Amended Agreement defines "Cause" as a determination that Kozyrkov has engaged in specifically enumerated prohibited conduct.

[6] The 2010 Agreement created a third class of members, Class C Members. Class C was to include employees who could purchase or be granted units pursuant to a Management Equity Ownership Plan. (Art. 5.2). Kozyrkov was not expressly included in or excluded from this group of potential members.

6

On July 3, 2013, Kozyrkov was terminated, triggering Aculocity's option to purchase his membership units. R. 1 ¶ 20(a). Aculocity exercised that option, but claimed that the purchase price for the units was $0, because Kozrykov contributed no cash to Aculocity to acquire his Class A units. *Id.* ¶ 20(b). Following his termination, Kozyrkov "repeatedly requested that Aculocity provide [him] . . . with complete and accurate accountings of the amounts of his cash contributions to Aculocity for the Units . . . and of the fair market value of the units." *Id.* ¶ 25. The 2006 Agreement provided that "books of account shall be kept at the principal office of the LLC, and each Member and the accountants, attorneys, and other designated agents of each Member shall at all reasonable times have free access to and the right to inspect the same Agreement," (Art. 10.12), but the 2010 Agreement omitted this language from an otherwise identical provision, (Art. 9.12). Aculocity refused to provide Kozyrkov with access to the company's books and records. *Id.*

Kozyrkov alleges that his termination constituted a breach of the 2010 Agreement in two ways. R. 1 ¶ 20. First, he alleges that Aculocity claimed falsely and in bad faith that the termination was for Cause, when in fact he had never engaged in any conduct prohibited by the Agreement. Second, he alleges that Aculocity breached the 2010 Agreement by refusing to consider the undistributed profits and undisbursed or reinvested distributions allocated to his capital account in determining the purchase price for his units. He also requests an accounting "of the amounts of his cash contributions to Aculocity for the Units and of the fair market value of the Units." *Id.* ¶ 30.

**Discussion**

Under Delaware law, the role of a court in interpreting a contract is to give effect to the intention of the parties as expressed in the agreed terms. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015) (citing *Norton v. K–Sea Transportation Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)). "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (citation omitted). Contracts are to be read as a whole, giving "each provision and term effect, so as not to render any part of the contract mere surplusage." *Id.* (citation omitted). In other words, courts are not to interpret a contract in such a way as to render a provision or term "meaningless or illusory." *Id.* (citation omitted); *accord Norton*, 67 A.3d at 365 n. 52 (recognizing the "goal of giving each [contract] term an independent meaning").

When a contract is clear and unambiguous, courts are to give effect to the plain-meaning of its terms and provisions. *Osborn*, 991 A.2d at 1160 (citations omitted). But when multiple and different interpretations can reasonably be ascribed to a contract, it is ambiguous and courts may consider extrinsic evidence of the parties' intent to construe its meaning. *Life Plans, Inc.*, 800 F.3d at 349-50. In general, ambiguities in a contract are to be construed against the drafter. *Osborn*, 991 A.2d at 1160 (citations omitted). Courts will not countenance an interpretation that "produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* (citations omitted).

The contract term at the heart of this motion is the buyout provision of the 2010 Agreement.[7] As set forth above, it contains a formula for the purchase price of Kozyrkov's membership units calculated by reference to "the amount of cash contributed by [Kozyrkov] to Aculocity for the Units." In this motion, Aculocity argues that its calculation of the purchase price as $0 was correct because (1) Kozyrkov did not make any "cash contributions" to Aculocity as defined by the Agreements; and (2) even if he did, those contributions are immaterial to calculating the purchase price because they were not made for the purpose of acquiring membership units. Kozyrkov counters that he understood that undistributed profits allocated to his capital account were to be considered "cash contributed for his Units" under the buyout clause. Applying the principles of contract construction set forth above, the Court addresses the parties' arguments.

A.   The phrase "amount of cash contributed" is ambiguous.

Aculocity begins its argument in support of dismissal by noting that the term "Cash Contributions" is defined in Article I of the 2010 Agreement as "the portion of the Capital Contributions constituting cash." Aculocity argues that the phrase "cash contributed by [Kozyrkov]" in the buyout clause refers back to the Article I definition of "Cash Contribution" as a "Capital Contribution constituting cash." The

---

[7]   Whether Kozyrkov was properly terminated for cause is a contested issue, but Aculocity concedes that Kozyrkov has adequately alleged claim for breach of contract on the basis of his for-cause termination. For the purposes of this motion, however, that is irrelevant; under either the without cause or for cause subsections of the contractual buyout provision, the purchase price for Kozyrkov's units depends on a determination of the "amount of cash," if any, he contributed to Aculocity "for the units." Whether Kozyrkov was damaged, therefore, depends on whether Aculocity breached the buyout provision.

9

Court sees no reason why it must. The buyout clause could have read "the amount of Cash Contributions made by Kozyrkov to Aculocity," but it refers more generally to "the amount of cash contributed by [Kozyrkov] to Aculocity." This phrasing could reasonably read to refer to cash contributed as part of a "Capital Contribution" or cash otherwise contributed to the capital of the organization for the operation of its affairs. Thus, the definition upon which Aculocity premises its argument does not provide an unambiguous, plain-meaning rule by which to interpret the buyout clause.[8]

Aculocity also cites a number of cases that distinguish between "distributable profits" or "retained profits" and "capital contributions" to argue that Kozyrkov's share of undistributed profits cannot, under well-established accounting principles, be considered "cash contributions." R. 20 at 10-11. All of the cases reflect the uncontroversial principle that undistributed profits from a limited liability company's operations are not the same as capital contributions by its members.[9] But the fact that "retained profits" are not "capital contributions" does not

---

[8] Even if the Court were to accept Aculocity's position that the buyout clause set pricing by reference to Kozyrkov's capital contributions only, that still would not require dismissal here. The Article I definition of "Cash Contributions" does not explicitly exclude *additional* contributions made from a member's earnings (Art. 5.5) (emphasis added). Kozyrkov alleges that any distributions authorized by management were reinvested by him in Aculocity. These allegations suggest he may have infused his own capital into the Company.

[9] Interestingly, the primary case on which Aculocity relies in advancing its argument suggests in dicta that on facts like those alleged here—where a distribution has been declared or profits are required to be distributed under the partnership agreement—retention of to-be-distributed profits is, in fact, tantamount to a forced capital contribution. *Brooke v. Mt. Hood Meadoes Oreg., Ltd.*, 81 Or. App. 387, 392-93 (Or. Ct. App. 1986).

necessarily defeat Kozyrkov's claim that he contributed cash to Aculocity, at least not at this stage of the proceedings. As explained above, the buyout clause does not limit the purchase price of Kozyrkov's units to the amount of his "capital contributions" that are "cash." Rather, it applies more broadly to "cash contributed by [Kozyrkov] to Aculocity." On its face, that does not necessarily exclude retained profits allocated to his capital account. Nothing in the case law requires a contrary interpretation of the contract.

Aculocity also argues that the meaning of the buyout clause is clarified by reference to the term "Capital Contributions," which is defined as "the amount of cash and the value of any property (other than cash) contributed to Aculocity with respect to the Units held by such Member." According to Aculocity, the differentiation of "cash" from "property (other than cash)" in this definition requires a finding that undistributed profits—though certainly payable in cash and measured in dollars and cents—are nevertheless "property (other than cash)." R. 20 at 8. The Court cannot see why this is the inevitable (or even preferred) reading of the contract; indeed, it seems strained to classify profits as anything other than cash. In support of its position, however, Aculocity notes that the 2010 Agreement explicitly states that "Each of the Class A Members . . . have contributed *property* to the capital of Aculocity and have received the[ir] respective Units." (emphasis added). According to Aculocity, the use of the word "property" as opposed to "cash" in this provision was intentional, because "[t]he principal consequence of the cash-[versus]-other-property distinction [in the definition of "Capital Contributions"]

11

pertained to what would happen in the event that Kozyrkov left the company (whether voluntarily or involuntarily)." R. 20 at 7-8. First, the Court is skeptical that this was the "principal consequence" of the distinction; multiple provisions of the Agreement consider the type of capital contribution underlying a member's interest for a variety of reasons.[10] More importantly, though, without the modifier "(other than cash)" beside it as set forth in the definition of "Capital Contribution," the term "property" used to describe the nature of Kozyrkov's contribution could just as reasonably be read to include property that *is* cash. Where, as here, multiple reasonable meanings can be ascribed to a contract term, the term is ambiguous.

Moreover, the logic of Aculocity's argument is suspect. If, as Aculocity argues, the term "property" was intentionally used in Section 5.1 "to bar . . . Kozyrkov [from] . . . get[ting] a distribution on termination," then the very existence of the buyout clause makes little sense. According to Aculocity's argument, unless Kozyrkov made an *additional* cash contribution–which the Agreement explicitly specified he was not required to do (*see* Art. 5.5)–then he never would have been able to collect any value for his units upon dissociation despite having "contributed property to the capital of Aculocity."[11] The Court cannot see how Kozyrkov, acting reasonably, could have agreed to a buyout provision knowing that regardless of the fair market value of his units, if he dissociated from Aculocity he would be forced to

---

[10] For instance, provisions regarding tax allocations, distributions in liquidation, and priority returns also turn on the type of capital contribution underlying the contributing member's interest.

[11] By the time the 2010 Agreement was executed, the "Vadim Option" to purchase additional Class A units at a fixed price had expired.

12

sell his shares for naught. The suggestion is absurd, particularly as it applies to the 2010 Amended Agreement which acknowledges that Kozyrkov made contributions for Class A Units.

Similarly, the Court is not convinced that Aculocity believed Kozyrkov was entitled to nothing under the buyout clause when the 2010 Agreement was signed. After all, if Aculocity believed the buyout price was limited to "cash contributions," and Aculocity also believed Kozyrkov was issued the units "for property" other than cash, then why would Aculocity include a follow-up provision in the buyout clause protecting itself from purchasing Kozyrkov's units at a price it could not afford? Section 8.7(e) reads, in relevant part:

> [I]n the event the aggregate payments due and payable . . . exceed $33^{1}/_{3}$% of Aculocity's net income (as determined by the Manager in the Manager's reasonable discretion), such payments shall be deferred for successive twelve-month periods, provided that any such deferral may not exceed 36 months.

The interpretation of the buyout clause advanced by Aculocity would render this provision "illusory," a "mere surplusage" devoid of any practical consequence. Such an interpretation is disfavored. This too creates ambiguity preventing the Court from deciding the contract's meaning at this stage in the proceedings.

In summary, none of Aculocity's arguments prohibit the interpretation of "cash contributed" that Kozyrkov advances in his Complaint and moving papers. Indeed, reading the Agreement as an objective third party, the Court finds Kozyrkov's interpretation to be a plausible one, consistent with the inclusion of a buyout clause and related provisions in the contract. In the end, there is at least

ambiguity as to what the phrase "cash contributed" means. That is sufficient to survive a motion to dismiss.

B.  The phrase "for the units" is also ambiguous.

Aculocity argues that even if the undisbursed authorized distributions can be considered "additional cash contributions" as Kozyrkov alleges, they are still irrelevant to determining the purchase price of Kozyrkov's units because they were not contributed by Kozyrkov for the purpose of acquiring his Class A units. Aculocity explains that "the Agreement does not provide that [Kozyrkov] gets back all the cash he contributed upon termination. Rather, he only gets back 'the amount of cash contributed by [him] to Aculocity *for the Units*.'" R. 20 at 12 (emphasis added). Aculocity interprets the phrase "for the units" to mean that the price must be set by reference to cash contributed "for the *acquisition of* the Units." But this is not the only reasonable interpretation of the phrase. "For the units" could just as easily mean to support the operation of the organization or otherwise fulfill the obligations of membership. In other words, regardless of whether Kozyrkov contributed cash to acquire his units, he most certainly left cash (on which he held a personal income tax obligation) in the business. That cash was used, presumably, to fund the operation of the business. Simply, it is not unreasonable to consider that Kozyrkov contributed cash to Aculocity precisely because he held membership units.

In addition, Aculocity argues that Kozyrkov's interpretation of the buyout clause "is completely inconsistent with" the provisions in the agreement prohibiting members from withdrawing any capital or seeking a partition or distribution of

corporate assets prior to the sale or dissolution of the company. The provisions Aculocity cites in support of this position state, in relevant part:

> 5.7 <u>Withdrawal of Capital Contributions</u>. Except as expressly provided herein, no member shall withdraw any capital from the LLC.
>
> 10.2 <u>Partition</u>. Each Member and Assignee irrevocably waives any right that the Member or Assignee may have to . . . (d) otherwise obtain a distribution of LLC assets which constitutes a return of any part of the Member's contribution to Aculocity prior to the occurrence of a Dissolution Event.

According to Aculocity, "[t]here is simply no way to reconcile these provisions, that no capital can be withdrawn and that [Kozyrkov] has waived his rights to obtain a return of any part of his capital contribution, with Kozyrkov's claim that he may obtain the value of allocations made to his capital account. Indeed, his reading would render both provisions meaningless because it would mean that all he had to do to get capital out was to quit or be fired." R. 20 at 9. This argument is puzzling, because even Aculocity acknowledges that the dissociation provision permitting a buyout of Kozyrkov's shares is "an exception to [these] waivers." R. 20 at 9.

More fundamentally, however, the reality is not quite as Aculocity says—Kozyrkov could not simply quit or be fired and remove his share of undistributed profits from the company. Instead, the Agreement provides that in the event Kozyrkov dissociates, his interest can be purchased at the option of the company, for the lesser of the value (or half the value if termination is for cause) of the cash he contributed for the units and their fair market value. Using the amount of "cash contributed for the units" as a benchmark for determining a buyout price does not, on its face, contravene the prohibitions against withdrawing capital.

15

The motion to dismiss the breach of contract claim is denied.

C. <u>Accounting</u>

In Kozyrkov's breach of contract claim he seeks "an accounting of the amounts of his cash contributions to Aculocity for the Units and of the fair market value of the Units." R. 1 ¶30. He alleges that he "has no adequate remedy at law by which he can determine these amounts." *Id.*

Kozyrkov does have an adequate remedy at law—this lawsuit. *See Drake Enter., Inc. v. Colloid Envtl. Tech. Co.*, 2009 WL 1789355, at *3 (N.D. Ill. June 24, 2009) ("Courts have dismissed claims for accounting where plaintiffs have plead a claim for breach of contract, which generally provides an adequate legal remedy.") (collected cases). All of the accounting information pertinent to this claim will be revealed through discovery. *Id.* at *2 (noting that the need to pursue an accounting cause of action has been "greatly minimized in light of the modern federal discovery rules). Kozyrkov has not alleged any reason discovery will be inadequate. Because the accounting claim gives Kozyrkov nothing he does not have in his breach of contract claim, the claim is superfluous. It is therefore dismissed.

**Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is denied in part and granted in part. The parties are directed to appear one week from the date of this Order to set a discovery schedule in this matter.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: February 9, 2017